**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1180
Fax: 212-465-1181
*Attorneys for Plaintiff and the Class*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

MARY WEST, *on behalf of herself and all others similarly situated*,

      Plaintiff,

         v.

METROPOLITAN TRANSPORTATION AUTHORITY and NEW YORK CITY TRANSIT AUTHORITY,

      Defendants.

---

Case No.:

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

# INTRODUCTION

1.      This action seeks redress for Plaintiff MARY WEST (hereinafter "Plaintiff"), individually and on behalf of all others similarly situated, for permanent personal injuries, pain and suffering, disability from usual activities, and financial injury as a result of being injured due to the negligence, recklessness, and carelessness of the METROPOLITAN TRANSPORTATION AUTHORITY and the NEW YORK CITY TRANSIT AUTHORITY (collectively, "Defendants").

2.      This action also seeks redress for Plaintiff individually and on behalf of all others similarly situated for defective design and negligent systematic practices in connection with Defendants.

3.      Plaintiff submitted notices of claim to Defendants on July 19, 2017, pursuant to the New York State General Municipal Law § 50-e. Plaintiff was deposed at a subsequent administrative hearing on October 9, 2017.

4.      The New York City Subway (hereinafter the "Subway") is designed and controlled by Defendants. As a result of Defendants' systematically negligent processes, Subway service is dangerous and unfit for human use, causing Plaintiff and Class members physical and financial injury.

5.      Accordingly, Plaintiff hereby brings this Complaint against Defendants, alleging the following violations: (1) defective design, (2) negligence, and (3) breach of the implied warranty of merchantability. Plaintiff and Class members seek injunctive relief. Plaintiff seeks compensation for damages she incurred and continues to incur as a direct and proximate result of Defendants' acts and omissions.

6.      The allegations in this Complaint are based on the personal knowledge of Plaintiff as to herself, and on information and belief as to all other matters.

1

## JURISDICTION AND VENUE

7.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because this is a class action, as defined by 28 U.S.C § 1332(d)(1)(B) whereby: (i) the proposed class consists of over 100 class members, (ii) a member of the putative class is a citizen of a different state than Defendants, and (iii) the amount in controversy exceeds the sum or value of $5,000,000, excluding interest and costs.[1]

8.     The Court has personal jurisdiction over Defendants because the Subway operates throughout New York State; Defendants engaged in the wrongdoing alleged in this Complaint throughout the New York city area, including in New York State; Defendants are authorized to do business in New York State; and Defendants have sufficient minimum contacts with New York State and/or otherwise have intentionally availed themselves of the markets in New York State, rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. Moreover, Defendants' activity within New York State is substantial.

9.      At all relevant times hereto, Defendants were authorized to conduct business in the State of New York, causing injury to a person within the State of New York that Defendants should reasonably have foreseen.

10.     Plaintiff submitted notices of claim to Defendants on July 19, 2017, pursuant to the New York State General Municipal Law § 50-e. Plaintiff was deposed at a subsequent administrative hearing on October 9, 2017.

11.     Pursuant to 28 U.S.C. § 1391(b)(2), this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein

---

[1] The amount in controversy includes the value of the injunctive relief sought. *DiTolla v. Doral Dental IPA of N.Y., LLC*, 469 F.3d 271, 276 (2d Cir. 2006).

occurred in this District. Plaintiff is a citizen of New York State. She resides in this District and utilized the Subway within this District. Moreover, Defendants designed and operated the Subway in this District.

## PARTIES

*Plaintiff*

12.     Plaintiff is, and has been at all times material hereto, a resident of New York County, New York. Plaintiff has been physically injured by Defendants' Subway, most recently on May 5, 2017. On that date, Plaintiff was attempting to board the Subway at the West 23rd Street Station when she fell into the ungated gap between the train and the platform. The defective design of the Subway and its platforms create substantial risk of injury or death, and Plaintiff was in fact injured due to this defective design. Furthermore, this risk has deterred her and Class members from full enjoyment of the Subway. Both before and after her injury on May 5, 2017, Plaintiff has suffered anxiety when using the Subway due to its unsafe design.

*Defendants*

13.     Defendant METROPOLITAN TRANSPORTATION AUTHORITY (hereinafter "Defendant MTA") is a public benefit corporation established by N.Y. Pub. Auth. Law § 1263. Defendant MTA is organized under the laws of the State of New York and headquartered at 25 Jamaica Avenue, Brooklyn, New York 11207. Its registered agent address for service of process is located at 2 Broadway, New York, NY 10004.

14.     Defendant MTA is a proper party because it finances the construction of the Subway facilities. N.Y. Pub. Auth. Law § 1265(3). Thus, Defendant MTA decides how the Subway system is designed. Defendant MTA's decisions determine whether or not the Subway facilities will be safe for all customers from the outset. Defendant MTA also establishes unified

3

mass transit policies that control how its subordinate entities, including Defendant NEW YORK CITY TRANSIT AUTHORITY, operate. Defendant MTA may be understood to operate its subordinate entities, as it "is intimately involved in the management, not only of its subsidiaries' finances, but of their real estate and other assets." *Greene v. Long Island R.R.*, 99 F. Supp. 2d 268, 273 (E.D.N.Y. 2000). Defendant MTA is a proper party for two independent reasons: (a) because it finances and plans Defendant NEW YORK CITY TRANSIT AUTHORITY's construction of Subway facilities that are unsafe to customers; and (b) because it controls the policymaking and operations of Defendant NEW YORK CITY TRANSIT AUTHORITY.

15.     Defendant NEW YORK CITY TRANSIT AUTHORITY (hereinafter "Defendant NYCTA") is a public benefit corporation established by N.Y. Pub. Auth. Law § 1201. Defendant NYCTA is organized under the laws of the State of New York and headquartered at 130 Livingston Street, Brooklyn, New York 11201. Defendant NYCTA is subordinate to Defendant MTA, as its governing board is comprised of Defendant MTA's governing board acting ex officio. N.Y. Pub. Auth. Law § 1201(1). Whatever the guise of Defendants' board members when they act to establish policies that cause injury to Plaintiff and the Class, Defendants' board members act according to the authority they have as both Defendant MTA board members and Defendant NYCTA board members.

16.     Defendant NYCTA is a proper party because it acquires transit facilities for the Subway and operates and maintains the Subway. N.Y. Pub. Auth. Law § 1202(1).

17.     Defendant MTA and Defendant NYCTA are each proper parties because they are irrevocably linked by the persons who manage both entities.

4

## FACTUAL ALLEGATIONS

### Many Customers Ride the Subway

18.    The Subway is the largest electrified rapid transit train system in the United States and the seventh largest such system in the world, with an annual ridership of 1.757 billion people in 2016.[2] On an average weekday in 2016, the Subway serves 5.7 million customers at its 472 stations. Many tourists, both domestic and international, ride the Subway.

19.    Due to the extensive use of the Subway by New York City's citizens and tourists, the safety of such an institution should be of paramount importance to Defendants.

### The Subway Is Systematically Unsafe

20.    Defendants have maintained a culture of reckless indifference to Subway passenger safety. Consequently, Defendants have designed and maintained systemically unsafe Subway facilities. Over the years, riders and some of Defendants' officers have complained about subway safety and the egregious lack of platform guardrails. Indeed, Defendants' negligence has incurred severe consequences, including injury and death of Subway passengers. David Jones, a board member of Defendant MTA, has requested that "transit officials look into platform barriers to figure out a cost, timetable for implementation and key stations where they could be installed."[3]

21.    The MTA's lack of platform guardrails has unreasonably compromised public safety, as is obvious from the multitude of newsworthy instances in which riders have fallen or been pushed onto the Subway tracks or otherwise fallen onto the Subway track. A few of of these instances are described below. These instances likely would have been ameliorated or prevented entirely if the Subway stations had guardrails installed.

---

[2] http://web.mta.info/nyct/facts/ffsubway.htm (Last Accessed 2/26/18).
[3] http://abc7ny.com/news/mta-re-considering-subway-safety-measures-following-shoving-incidents/1607646/ (Last Accessed 3/01/18).

22.     On September 6, 2010, a man was pushed onto the tracks by an unknown stranger and hit the electrified third rail. He survived with severe injuries.[4]

23.     In December 2012, a mentally unstable woman pushed Bangladeshi Sunado Sen, 36, in front of a "7" train in Woodside, Queens. Sen was killed.

24.     During the same month, a homeless person pushed Ki Suk Han, 58, of South Korea, in front of a "Q" train at the 49th Street Station in Times Square after a heated exchange.[5] As depicted in the newspaper photo below, Han attempted to climb out of the tracks as the "Q" train approached the 49th Street Station.[6] Unfortunately, Han was unable to climb out in time and he was killed. A picture of him attempting to escape was prominently featured in the media and sparked public debate about subway safety, although this coverage did not spur Defendants to undertake the necessary safety measures:

---

[4] http://www.nydailynews.com/new-york/andy-morris-survives-625-volt-zap-pushed-live-rail-drunken-brawl-article-1.440557 (Last Accessed 3/8/18).
[5] http://nypost.com/2014/11/17/at-least-4-people-pushed-in-front-of-subways-in-less-than-two-years/ (Last Accessed 6/8/17).
[6] http://nypost.com/2012/12/04/suspect-confesses-in-pushing-death-of-queens-dad-in-times-square-subway-station/ (Last Accessed 6/8/17).



[7] http://fox2now.com/2012/12/05/nypd-make-arrest-in-subway-push-death-image-causes-ethical-question/ (Last Accessed 3/14/18).

25.     On June 1, 2015, a stranger attacked a transgender woman at the Bleeker Street station in an apparent hate crime, throwing objects at her and pushing her onto the tracks. She survived by escaping before an incoming train could hit her.[8]

26.     On March 5, 2016, a 15-year-old girl was pushed onto the track. She survived by squeezing into a small space between the platform and an oncoming train.[9]

27.     On June 10, 2016, a man was seriously injured when he fainted and fell onto the tracks at the City Hall station for the "R" train. Bystanders jumped onto the tracks and lifted him up to the platform.[10]



---

[8] http://abcnews.go.com/US/transgender-woman-pushed-ny-subway-tracks-hate-crime/story?id=31505252 (Last Accessed 3/07/18).

[9] https://nypost.com/2016/03/06/teen-dodges-oncoming-subway-after-being-pushed-onto-tracks-police-say/ (Last Accessed 3/07/18).

[10] https://www.nytimes.com/2016/06/15/nyregion/in-a-race-to-save-a-man-on-the-tracks-a-reminder-of-whats-good-in-the-world.html (Last Accessed 3/07/18).

28.     On November 7, 2016, a 49-year-old woman from Queens was shoved into the path of a "1" train at Grand Central Station, a station where "more than 200,000 people navigate the tunnels there every day."[11]

29.     On January 25, 2017, Luis Henriquez was shoved onto the tracks at the 170th Street Station in Mount Eden as a northbound "D" train approached the station.[12] Henriquez's left leg was struck and the train's "wheel crushed the avid salsa dancer's left foot, which was so badly mangled that doctors had to amputate it." *Id.* Below is a sobering photo of Henriquez laying in a hospital bed with his left foot amputated. *Id.*

---

[11] https://www.nytimes.com/2016/11/08/nyregion/person-thrown-in-front-of-subway-train-is-killed-police-say.html?_r=0 (Last Accessed 6/8/17).
[12] http://www.nydailynews.com/new-york/nyc-crime/cops-arrest-man-pushing-stranger-bronx-subway-tracks-article-1.2958047 (Last Accessed 6/9/17).



30.     On August 22, 2017, a stranger suddenly pushed Kamala Shrestha onto the northbound "F" train track at the station at Second Avenue and Houston Street. She was injured from the fall.[13]



31.     The violent incidents above could have been prevented if guardrails were installed in the Subway stations. The addition of guardrails would have allowed the victims more protection and lessened the likelihood of being pushed onto the tracks.

32.     In addition to instances of people being pushed or falling onto the Subway tracks, the lack of platform guardrails has also compromised the safety of blind Subway customers.

33.     In 2014, Luis Veloz, a blind pianist, was nearly killed on the G-train platform at the Church Avenue Station. Veloz was following the yellow tactile paving strip with his walking stick when the bumped strip disappeared, leaving him confused and disoriented. He lost his sense of

---

[13] http://abc7chicago.com/subway-push-suspect-to-victim-maybe-well-die-together/2337769/ (Last Accessed 3/14/18.)

balance and equilibrium, causing him to fall into the tracks."[14] The accident has cost Veloz upwards of $1 million in medical bills and future loss of earnings, since he cannot "move [his] fingers the same way" and "can no longer play a song." *Id.* A guardrail would have protected Veloz and prevented him from falling onto the tracks.

## Defendants Are Aware That the Subway Is Unsafe

34.     Defendants' actions and statements demonstrate that they are aware that the Subway is unsafe without guardrails. Multiple types of documents and statements produced by Defendants each independently demonstrates Defendants' knowledge and lack of concern for safety. Such sources include: Defendants' advertised safety warnings, Defendants' internal memos, Defendants' construction plans, public statements by Defendants' officers, and the Subway's physical infrastructure. All of these sources demonstrate that Defendants not only know that they should implement guardrails, but that they also have the financial means to construct them but simply choose not to.

### *Defendants' Safety Posters Are Ineffective and Insufficient*

35.     In 2012, Defendants implemented a new publicity campaign to remind customers to "Stand away from the platform edge."[15] This message was "widely disseminated across a wide range of materials and announcement platforms." *Id.* Defendants' article describing the campaign notes that a fall onto the Subway tracks can "result in severe injury or even death." *Id.* Clearly, Defendants are aware of the dangers of a Subway lacking guardrails. Nonetheless, their campaign has had little effect.

---

[14] http://nypost.com/2016/12/12/blind-man-suing-mta-for-subway-fall-that-changed-everything/ (Last Accessed 6/9/17).
[15] http://www.mta.info/news/2012/06/20/new-series-posters-warn-customers-stay-back-platform-edge (Last Accessed 3/07/18).

36.     Defendant's public service announcements are no substitute for actual safety features. Defendant's messages do not prevent injuries and death, yet Defendant simply repeats its messaging with updated injury and death totals. Compare below the 2011 signs with the 2016 signs discussing the danger of train collisions and citing train-impact accidents:







# See Someone at Risk? Get Help.

Alert a police officer, train or station personnel. Or, use a station "Customer Assistance Intercom."

**146 people were struck by trains in 2011. 47 were killed.**

**Be Safe. Be Smart. Get Help.**

## ¿Ve a alguien en peligro? Pida ayuda.

Informe a un oficial de policía, o al personal del tren o la estación. Utilice uno de los "intercomunicadores de ayuda para los usuarios" de las estaciones.

En el año 2011, 146 personas fueron atropelladas por trenes. 47 murieron.

Cuídese. Sea inteligente. Pida ayuda.

## 看到某人有危險？獲得協助。

向警官、列車或車站工作人員報警。或使用車站的「顧客援助對講裝置」。

2011 年有 146 人遭到列車撞擊。47 人死亡。

確保安全。保持明智。獲得協助。

## 위험에 처한 누군가를 보셨나요? 도움을 요청하세요.

경찰이나 지하철 직원에게 알리세요. 또는 지하철역의 "고객지원 인터콤"을 이용하세요.

2011년에 146명이 기차에 부딪혔습니다. 47명이 사망했습니다.

안전하게. 지혜롭게. 도움을 요청하세요.

## Видите человека в опасности? Позовите на помощь.

Сообщите офицеру полиции, персоналу в поезде или на станции. Воспользуйтесь «Линией содействия пассажирам» («Customer Assistance Intercom») на станции.

В 2011 году 146 человек попали под поезд. 47 из них погибли.

Будьте осторожны. Будьте благоразумны. Позовите на помощь.

14





37.     Defendants' Subway still injures and kills approximately the same number of people per year, despite the existence of the public service announcements. Furthermore, these train collision statistics understate the scope of the problem: many people who fall onto the tracks are injured without being hit by a train, while other people who fall are not injured and escape before being hit by a train.

### Defendants' Internal Documents State that Gates or Handrails Are Beneficial Safety Features

38.     In Defendants' "Eye on the Future" memo, Defendants state that they plan to improve safety at the 68 St-Hunter College Station by constructing "platform warning strips and handrails" and modifying "gates" in June 2018.[16] Handrails will also be implemented at the Rockaway Parkway Station in May 2018. Defendants are therefore demonstrably aware that these safety measures are necessary. These measures should be implemented at all stations, not just two.

### Defendants' Subway Plans Include Safety Guardrails Because They Are Necessary, but Defendants Cut Those Features for Financial Reasons While Overspending in Other Areas

39.     Defendants' newest Subway line, the Second Avenue Subway, had originally been designed with platform guardrails. The project ultimately went overbudget by $700 million after scrapping the safety features.[17] Defendants' misprioritization of funds is not only wrong, it constitutes illegal negligence of passengers' safety.

### Defendants' Officers State that Safety Guards are Necessary, but too Expensive—Even Though They Could be Installed at No Cost

40.     Defendants cite cost as the reason they have not installed platform screen doors. Tom Prendergast, Defendant MTA's interim executive director in 2013, stated that Defendants would like to "take a look" at the doors, but that they could cost more than $1 million per station.[18] Clearly, Defendants are more interested in the expense of the safety materials, rather than the

---

[16] http://web.mta.info/mta/capital/eotf-descrip.htm (Last Accessed 6/08/17).
[17] http://gothamist.com/2016/12/29/2nd_ave_subway_explainer.php#photo-1 (Last Accessed 6/08/17).
[18] https://www.politico.com/states/new-york/albany/story/2013/01/after-subway-push-killings-and-lhotas-resignation-the-mta-considers-platform-screen-doors-000000 (Last Accessed 3/07/18).

benefits. However, Defendants are simply indifferent to Subway passenger safety and are uninterested in installing safety features.

41.     Cost is not a legitimate obstacle to installing the required safety features in Subway stations. As Prendergast noted, Defendants have "seen some interest from vendors eager to offset those costs with advertising." *Id*. In fact, private companies are willing to pay the **entire** cost of platform screen door installation.

42.     Infrastructure corporation Crown Infrastructure submitted a proposal to the city in which it would cover the cost of installing the doors if it could keep all of the revenue from the advertising that would be placed on the doors.[19] The plan was summarily rejected, and Defendants' Subway stations remain criminally dangerous. Despite the obvious dangers of falling from the Subway platforms (a) into the gap between the platform and the train or (b) onto the track, Defendants refuse to advise or warn passengers regarding what they should do in such a situation.[20]

***Defendants have Already Installed Simple Fences on Some Subway Platforms, Increasing Safety at Very Low Cost***

43.     Although they are of limited effectiveness, Defendants have installed static fences on some Subway platforms, such as the "S" platform at the Times Square Station. These fences are fixed with gaps between them such that when a train stops at the station, the train doors are not blocked by the fences:

---

[19] http://www.nydailynews.com/new-york/claim-mta-botched-safety-deal-article-1.1230482 (Last Accessed 3/01/18).
[20] https://www.politico.com/states/new-york/city-hall/story/2012/12/what-should-you-do-if-youre-pushed-onto-the-tracks-dont-says-the-mta-000000 (Last Accessed 3/08/18).



44.     This system requires minimal cost to implement or maintain. The disadvantage of fences is that they leave much of the platform edge permanently open, so fences do not provide fully adequate safety and many falls onto the track would still occur.

**Plaintiff's Story: The Consequences of Defendant's Reckless Indifference**

45.     Defendants' culture of reckless indifference to public safety led directly to the injury of Plaintiff.

46.     Plaintiff is a resident of 135 West 23rd Street, Apt. 702, New York, NY 10011. Plaintiff was born in 1952 and has been using the subway for nearly her entire life. On May 5, 2017, at approximately 1:30 p.m., Plaintiff walked into the West 23rd Street Station and approached the platform. Plaintiff planned to take a "1" train one stop uptown to the West 28th Street station, in order to attend a writing group at the SAGE Center Midtown located at 305 7th Avenue, New York, NY 10001.

47.     Upon entering the Subway platform at the West 23rd Street station, Plaintiff walked to the south end of the station. Once the uptown bound "1" train pulled into the station, Plaintiff attempted to board the train when her left foot fell in the gap between the train and the Subway platform, causing her to fall partly into the gap and partly onto the train. After her fall, fellow passengers helped lift her out of the gap to safety and onto the train.

48.     Plaintiff's foot fell cleanly through the gap between the train car and the platform, despite the fact that Plaintiff's shoe is nearly one-foot long. Once she lost her footing, she fell until her calf jammed into the gap. Due to the absence of a gate or guardrail, Plaintiff became disoriented and did not step straight onto the Subway, instead stepping somewhat sideways such that her entire foot fit into the gap. Due to the absence of a gate or guardrail, Plaintiff had nothing to hold onto to arrest her fall. Guardrails would have mitigated the impact of her fall.

49.     This fall caused severe hurt to Plaintiff's left leg. The extensive amount of bruising that she suffered from the fall forced her to be bedridden for approximately three weeks.

50.     Although Plaintiff felt that she should go to the hospital shortly after her injury, she was in shock and in immense pain and was therefore unable to make the journey. A few days after, she was able to see a physician's assistant at a medical clinic.

51.     Below are photos of her injury.







52. Since the fall, Plaintiff has experienced severe mental distress at the prospect of boarding trains, for fear of falling into the gap again. If guardrails were installed, Plaintiff and Class members could feel more comfortable boarding trains.

53. Plaintiff submitted notices of claim to Defendants on July 19, 2017, pursuant to the New York State General Municipal Law § 50-e. Plaintiff was deposed at a subsequent administrative hearing on October 9, 2017.

**Defendants' Actionable Conduct**

54. Defendants are in the business of operating the Subway and serving people throughout the New York City area.

55. Defendants promoted and continue to promote the Subway as being safe for riders. Relying on these or other similar representations, Plaintiff and Class members reasonably believed

in the quality and safety of the Subway and had no reason expect that it posed a risk of adverse health consequences.

56.     Plaintiff and Class members were misled into using the Subway, which did not provide the quality of safety that they reasonably expected to receive and believed they were receiving. As a result of Defendants' negligent systematic process and negligent acts and practices, Plaintiff and Class members used a service that did not have a reasonable expectation of safety. Defendants thus created and failed to mitigate the unreasonable dangers associated with utilizing the Subway that are liable to cause serious health problems to riders, including the risk of falling from the Subway platform.

57.     Defendants owed a legal duty to Plaintiff and Class members to exercise reasonable care by formulating and operating a metro system that was safe for human use. Defendants knew or should have known that their failure to ensure reasonable safety standards would permit people to fall on the Subway platform, creating grave dangers for the health of Subway customers.

58.     Plaintiff and Class members would not have used the Subway had they known it was vulnerable to risks of falling within the Subway platform.

59.     Plaintiff and Class members had no way of independently discovering Defendants' faulty systematic infrastructure and platform features or of determining how little importance was placed on public health and the safety of riders.

60.     Defendants breached their duty to Subway passengers, which directly and proximately resulted in Plaintiff and other Class members suffering physical injury and suffering, financial injury, personal expenditure of time and resources, and mental anguish.

61.     Moreover, given Defendants' duty not to expose Plaintiff and Class members to potentially negligent systematic processes, Plaintiff and Class members are entitled to the

reasonable value of the cost of medically monitoring themselves since the need for medical monitoring is a predictable consequence of falling within a train platform.

**Plaintiff's Injury Is Directly Traceable to Defendant's Acts and Omissions**

62.     Defendants' reckless and irresponsible systematic process permitted the Subway to facilitate conditions in which Plaintiff could fall on the subway platform.

63.     While the discovery of one person falling on the Subway platform might be justified as a random accident, Plaintiff's experiences and the similar experiences of others betrays Defendants' systematic indifference to the safety of Subway platforms.

**Defendants Should Implement a Solution**

64.     Defendants are obligated to correct the dangers they have facilitated in the Subway stations. Defendants have several options for keeping their customers safe.

65.     Defendants could have prevented Plaintiff's fall by installing Platform Screen Doors (PSD) at the West 23rd Street station. These glass floor-to-ceiling high barriers would have allowed all passengers, including Plaintiff, to line up to board in an organized fashion, which in turn would have prevented jostling and falls. These doors would also provide passengers with something to hold onto as they board the train, also preventing falls. When a train is not in the station, the closed gate prevents accidental falls, suicides, homicides, and the poor judgment that sometimes leads riders to enter the tracks in order to retrieve fallen items. Platform Screen Doors also have other advantages, like improved climate control within stations, preventing litter accumulation and fire hazards, improving the acoustic quality of platform announcements, lessening wind felt by passengers waiting on the platform, and improving security by preventing passengers from venturing into subway tunnels. A PSD system would be a much-needed addition to the Subway platform safety, at the West 23rd Street station and all the other 471 MTA stations.

66.     Defendants could also have prevented Plaintiff's fall with Automated Platform Gates. These are chest-high sliding door safeguards that prevent passengers from falling into subway tracks. Automatic Platform Gates are cheaper to install because they require less material to construct than Platform Screen Doors.[21]

67.     Automatic Platform Gates in the West 23rd Street station would have allowed all passengers, including Plaintiff, to line up and then board trains in an orderly fashion, which would prevent jostling and falls. Automated Platform Gates would have allowed Plaintiff and other passengers to have a handhold as they entered the train. When the train is not in the station, the closed gate prevents falls. These chest high platform screen doors open in alignment with the train doors. This rudimentary system would have prevented Plaintiff from falling in the gap between the subway platform and the train. In fact, Defendants themselves have installed rudimentary metal fencing along parts of the "S" shuttle train platform at their Times Square Station and parts of the "E" train platform at their Court Square-23rd Street Station, proving that they recognize the nature of the problem and the need for a solution.

**Solutions to the Danger of the Subway Exist in Other Parts of the World**

68.     Platform Screen Doors have been installed in many subway systems all over the world, including major European cities like Paris, Rome, and London, as well as major Chinese cities like Hong Kong, Beijing, and Shanghai. New York is comparable to these cities in terms of population and resources, yet its subway system lags conspicuously behind. Platform Screen Doors have also been installed in the cities of less developed nations with markedly fewer financial resources than New York City, like New Delhi, India and Bangkok, Thailand.[22] Thus, there can be no real financial obstacle to installing these systems in New York City. While New York's

---

[21] https://en.wikipedia.org/wiki/Platform_screen_doors (Last Accessed 7-10-17).
[22] https://en.wikipedia.org/wiki/Platform_screen_doors (Last Accessed 7/10/17).

subway system is fairly old, with the first station opening in 1904[23], the Paris and London systems are even older, with their first stations opening in 1900 and 1863 respectively.[24] Thus, the antiquity of the system is also no obstacle to installing Platform Screen Doors.

69.    Other modern countries whose transportation systems who utilize Automatic Platform Gates include Japan's Toei Subway[25] as well as the Imazatosuji Line of Osaka's Municipal Subway, whose safeguards are "1.3 meters in height and open and close simultaneously with train doors."[26]

## CLASS ACTION ALLEGATIONS

70.    Plaintiff WEST seeks to represent a class consisting of:

All persons or entities who were exposed to Defendants' representations in New York and used the Subway in New York during the applicable limitations period, and/or such subclasses as the Court may deem appropriate ("the Class").

71.    The proposed Class excludes current and former officers and directors of Defendants, members of the immediate families of the officers and directors of Defendants, Defendants' legal representatives, heirs, successors, assigns, and any entity in which they have or have had a controlling interest, and the judicial officer to whom this lawsuit is assigned.

72.    Plaintiff reserves the right to revise Class definitions based on facts learned in the course of litigating this matter.

73.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through the appropriate discovery, Plaintiff believes that there are

---

[23] https://en.wikipedia.org/wiki/History_of_the_New_York_City_Subway (Last Accessed 3/07/18).
[24] https://en.wikipedia.org/wiki/Paris_Metro; https://en.wikipedia.org/wiki/London_Underground (Last Accessed 3/07/18).
[25] http://www.railway-technology.com/projects/toei-subway-tokyo-kanto-japan/toei-subway-tokyo-kanto-japan3.html (Last Accessed 7/10/17).
[26] https://www7.dict.cc/wp_examples.php?lp_id=1&lang=en&s=subway%20network (Last Accessed 7/10/17).

thousands of members in the proposed Class. Other members of the Class may be identified from records maintained by Defendants and may be notified of the pendency of this action by mail, or by advertisement, using the form of notice similar to that customarily used in class actions such as this. Other members of the Class may be notified by advertisements of the same type as those Defendants use to warn people of the dangers of falling into the gap.

74.     Plaintiff's claims are typical of the claims of other Class members as all Class members are similarly affected by Defendants' wrongful conduct.

75.     Plaintiff will fairly and adequately protect the interests of Class members in that Plaintiff has no interests antagonistic to those of the other Class members. Plaintiff has retained experienced and competent counsel.

76.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages sustained by individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for them to individually seek redress for the wrongful conduct alleged herein. If class treatment of these claims were not available, Defendants would likely unfairly receive hundreds of thousands of dollars or more in improper charges.

77.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the common questions of law and fact to the Classes are:

      i.  whether Defendants made misrepresentations and/or deceptive omissions concerning the safety of the Subway;

     ii.  whether Defendants' Subway is dangerous;

iii. whether Plaintiff and Class members sustained injuries or damages as a result of Defendants' negligence and dangerous Subway system;

iv. whether Plaintiff and Class members are entitled to equitable relief and prospective injunctive relief enjoining Defendants from continuing to facilitate and operate a dangerous and negligent system as alleged in this Complaint; and

v. whether Defendants' conduct rises to the level of reprehensibility under applicable law such that the imposition of punitive damages is necessary and appropriate to fulfill the societal interest in punishment and deterrence, and the amount of such damages and/or their ratio to the actual or potential harm to the Class.

78. The prosecution of this action as a Class action will reduce the possibility of repetitious litigation. Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

79. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by any individual class member are too small to make it economically feasible for an individual class member to prosecute a separate action, and it is desirable for judicial efficiency to concentrate the litigation of the claims in this forum. Furthermore, the adjudication of this controversy through a class action will avoid the potentially inconsistent and conflicting adjudications of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

80. The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(2) are met, as Defendants have acted or refused to act on grounds

generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

81.    The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(3) are met, as questions of law or fact common to the Class predominate over any questions affecting only individual members and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

82.    The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. Additionally, individual actions may be dispositive of the interest of all Class members even though certain Class members are not parties to such actions.

83.    Defendants' conduct is generally applicable to the Classes as a whole and Plaintiff seeks, *inter alia*, equitable remedies with respect to the Classes as a whole. As such, Defendants' systematic policies and practices make declaratory relief with respect to the Classes as a whole appropriate.

## CAUSES OF ACTION

### COUNT I

**STRICT PRODUCTS LIABILITY**
**(Defective Design)**
*(Brought on Behalf of Plaintiff and the Class)*

84.    Plaintiff realleges and incorporates herein by reference the allegations contained in all the preceding paragraphs of this Complaint, as if fully set forth herein, and further alleges as follows.

85.     At all times herein mentioned, Defendants designed, researched, constructed, advertised, promoted, marketed, sold and/or distributed the Subway and tickets to the Subway used by Plaintiff.

86.     In order to plead a manufacturing defect a plaintiff must assert that (1) the product was not reasonably safe as marketed; (2) the plaintiff used the product for a normal purpose; (3) by exercising reasonable care, plaintiff would not have discovered the defect and apprehended its danger; and (4) plaintiff would not have otherwise avoided injury by exercising ordinary care. *Derienzo v. Trek Bicycle Corp.*, 376 F.Supp.2d 537, 560 (S.D.N.Y. 2005).

87.     Element #1 is satisfied because the Subway was not reasonably safe as marketed. As shown by the numerous accidents and Defendants' consideration of additional safety measures, the Subway is unsafe.

88.     Element #2 is satisfied because Plaintiff used the Subway for its normal, intended purpose: traveling to a destination.

89.     Element #3 is satisfied because Plaintiff could not have discovered the danger of the Subway through the exercise of reasonable care. Plaintiff was forced to approach the gap in order to board the train. Given the crowd of customers that was boarding the Subway trains and the absence of safety features, a misstep occurred and Plaintiff fell into the gap. Defendants are in unique position to know that the Subway frequently injures passengers and is very dangerous, whereas any individual rider may undertake many trips before being injured.

90.     Element #4 is satisfied because Plaintiff could not have prevented her injury through the exercise of ordinary care. Plaintiff displayed reasonable care by boarding the train slowly and surely, in a sober state of mind. Plaintiff behaved no differently than she had during the countless other times that she had boarded a Subway train. She was fortunately able to board

safely in the past, but the risks of repeatedly hazarding the dangerous features of the Subway finally caught up to her.

91.     To establish a *prima facie* case of manufacturing defect, the plaintiff "may rely upon the circumstances of the accident and proof that the product did not perform as intended." *Hare v. Hoveround Corp.*, No. 06-CV-1081 (NAM/GHL), 2009 U.S. Dist. LEXIS 87146 (N.D.N.Y. Sep. 22, 2009) (citing *Brown v. Borruso,* 238 A.D.2d 884, 885, 660 N.Y.S.2d 780 (4th Dept. 1997)).

92.     In combination with Defendants' consideration of additional safety measures, the circumstances of Plaintiff's injury establish that the Subway was defectively manufactured—that is, manufactured without the safety precautions appropriate for use.

93.     As a direct and proximate result of Defendants' manufacturing process, Plaintiff suffered physical injury and/or economic harm.

94.     Defendants' actions and omissions as identified in this Complaint show that Defendants acted maliciously and intentionally disregard the rights of Plaintiff, thus warranting the imposition of punitive damages.

## COUNT II

**NEGLIGENCE**
**(Negligent Acts and Omissions)**
*(Brought on Behalf of Plaintiff and the Class)*

95.     Plaintiff realleges and incorporates herein by reference the allegations contained in all the preceding paragraphs of this Complaint, as if fully set forth herein, and further alleges as follows.

96.     Defendants owed Plaintiff and the Class a duty to construct a Subway system with guardrails installed around the tracks in the stations. This duty was independent of any contractual duties Defendants may owe or have owed.

97.     The cost that would have been borne by Defendants for installing guardrails during the original construction or renovation of a Subway platform would be insignificant in light of the dangers posed to Plaintiff and the Class by Defendants' failure to construct a safe Subway platform. Defendants' failure to install Subway guardrails during the original construction or renovation was a departure from the reasonable standard of care. Accordingly, Defendants' breached their duties to Plaintiff and the Class. As a direct, reasonably foreseeable, and proximate result of Defendants' failure to exercise reasonable care by initially installing guardrails, Plaintiff and the Class have suffered damages, including physical injuries and financial damages. Plaintiff and the Class could not have prevented the injuries or damages caused by Defendants' negligence through the exercise of reasonable diligence. Neither Plaintiff nor the Class contributed in any way to Defendants' failure to install guardrails during the original construction or updating of the Subway stations. Plaintiff, individually and on behalf of the Class, seek to recover the damages caused by Defendants. Because Defendants acted fraudulently and with wanton and reckless misconduct, Plaintiff also seeks an award of exemplary damages.

## COUNT III

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
*(Brought on Behalf of Plaintiff and the Class)*

98.     Plaintiff realleges and incorporates herein by reference the allegations contained in all the preceding paragraphs of this Complaint, as if fully set forth herein, and further alleges as follows.

99.     In "a breach of warranty of merchantability claim, Plaintiff must allege that the product is not fit for the ordinary purposes for which such goods are used." *Gasque v. Thor Motor Coach*, 2017 NY Slip Op 50122(U), ¶ 3 (Sup. Ct.) (citing *Bradley v. Earl B. Feiden, Inc.*, 8 NY3d 265, 273, 864 N.E.2d 600, 832 N.Y.S.2d 470 (2007)).

100.     Defendants impliedly warranted and represented through advertisements, marketing, websites and other material that the Subway fit the ordinary purposes of transportation—namely, transporting customers in a safe fashion.

101.     Defendants breached said warranty because the Subway system Plaintiff and the Class purchased tickets for is unreasonably dangerous.

102.     As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiff purchased unsafe products and her daughter was physically harmed as a result.

103.     As a direct and proximate result of Defendant's breach, Plaintiff has been damaged in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks judgment against Defendants as follows:

A.  An order requiring complete and immediate disclosure of all studies, reports, analyses, data, compilations, and other similar information within the possession, custody, or control of Defendants concerning, relating to, or involving the safety of the Subway;

B.  An order barring Defendants from destroying or removing any computer or similar records which record evidence related to the purported health and safety of the Subway;

C.  An order awarding compensatory damages in the amount to be determined for all injuries and damages described herein;

D.  An order awarding punitive damages to the extent allowable by law, in an amount to be proven at trial;

E.  An order awarding restitution and disgorgement of Defendants' revenues from Plaintiff and the Class;

F.  An order awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining Defendants from continuing the unlawful practices as set forth herein, and directing Defendants to identify, with Court supervision, other victims of their conduct and provide them with restitution and disgorgement of all monies acquired by means of unlawful conduct;

G.  An order compelling Defendants to implement a solution;

H.  Attorney fees and costs; and

I.  Such other relief as may be just and proper.

34

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a jury trial on all claims so triable.


Dated: March 21, 2018

Respectfully submitted,

**LEE LITIGATION GROUP, PLLC**

By: _____ /s/ *C.K. Lee* _____
          C.K. Lee, Esq.

C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
30 East 39th Street, Second Floor
New York, NY 10016
Telephone: (212) 465-1188
Facsimile: (212) 465-1181
*Attorneys for Plaintiff and the Class*