**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1180
Fax: 212-465-1181
*Attorneys for Plaintiffs and the Class*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

MARY WEST and JENIE LEE MARIANI, *on behalf of themselves and all others similarly situated*,

      Plaintiffs,

        v.

METROPOLITAN TRANSPORTATION
AUTHORITY, NEW YORK CITY TRANSIT
AUTHORITY, and LONG ISLAND RAIL ROAD
COMPANY d/b/a MTA LONG ISLAND RAIL
ROAD COMPANY,

      Defendants.

---

**Case No.:** 1:18-cv-01743-WFK-RML

**FIRST AMENDED CLASS
ACTION COMPLAINT**

JURY TRIAL DEMANDED

# **INTRODUCTION**

1.      This action seeks redress for Plaintiff MARY WEST and Plaintiff JENIE LEE MARIANI (hereinafter "Plaintiffs"), individually and on behalf of all others similarly situated, for permanent personal injuries, pain and suffering, disability from usual activities, and financial injury as a result of being injured due to the negligence, recklessness, and carelessness of the METROPOLITAN TRANSPORTATION AUTHORITY, NEW YORK CITY TRANSIT AUTHORITY, and LONG ISLAND RAIL ROAD COMPANY d/b/a MTA LONG ISLAND RAIL ROAD COMPANY (collectively, "Defendants").

2.      Defendants are responsible for the New York City Subway ("Subway") and its associated commuter railroads, the Long Island Rail Road ("LIRR") and Metro-North Commuter Railroad (collectively, the Subway and commuter railroads comprise the "Transit System"). The Transit System is designed and controlled by Defendants. As a result of Defendants' systematically negligent processes, the Transit System is dangerous and unfit for human use, causing Plaintiffs and Class members physical and financial injury.

3.      This action also seeks redress for Plaintiffs individually and on behalf of all others similarly situated for defective design and negligent systematic practices in connection with Defendants' Transit System.

4.      Plaintiff WEST additionally seeks redress on behalf of all other visually impaired Transit System passengers. Visually impaired people are unable to defend themselves from assailants who would push them onto the track. Their disability prevents them from noticing and avoiding dangerous people who are acting erratically and otherwise displaying signs of mental illness. This prevents people such as Plaintiff WEST from being able to ride the Transit System without fear, and as a result she rides it as little as possible when she is not accompanied by a

sighted person. She does not have the free and equal access to the Transit System that non-disabled people enjoy. The safety features described herein would protect visually impaired people and prevent them from fearing to ride the Transit System.

5.      In addition to her fear of being pushed onto the track, as a visually disabled person Plaintiff WEST is in danger of falling into the gap between the train and the platform because she has difficulty determining (a) the exact location of the platform edge and (b) her orientation. Transit System stations have two-foot "tactile strips" that are intended to prevent visually disabled people from wandering onto the track.[1] However, these strips do not assist boarding because they do not orient visually impaired people regarding exactly how far from the edge they are or where the train door is.

6.      The absence of safety features in the Transit System causes visually impaired passengers to be disoriented. Defendants' trains are overcrowded, and it is impossible for visually impaired people to situate themselves out of the way of the train doors and the outrush of arriving passengers. The trains stop in stations haphazardly, at random locations. For any given station, train doors open onto a different part of the platform each time. Visually disabled passengers such as Plaintiff WEST often lose their orientation in the scramble to locate the train door, make way for exiting passengers, and board the train. This problem is exacerbated by the short time that passengers have to board passenger cars in the Transit System.[2]

---

[1] http://web.mta.info/accessibility/rail.htm (Last Accessed 7/09/18).
[2] The Department of Transportation has noted that disabled people require extra time to board rail vehicles: "One other concern that has come to the Department's attention is that transportation systems (particularly some rail systems) may make it difficult for persons with disabilities to board or disembark from vehicles by very rapidly closing doors on the vehicles before individuals with disabilities (who may move more slowly through crowds in the vehicle or platform than other persons) have a chance to get on or off the vehicle. This is a situation in which a facially neutral action (closing the doors in a given number of seconds) operates disproportionately to the disadvantage of individuals with disabilities." 56 FR 45584, 45618.

7.	Platform safety barriers, consisting of a barrier with gates that align with train doors,[3] would solve these problems by (a) preventing people from falling onto Transit System tracks, (b) enabling passengers to wait for the train to the side of the train doors, so they would not become disoriented by passengers exiting the train, (c) providing an easy way for visually impaired passengers to orient themselves (because the barrier would be exactly parallel with the track), and (d) supplying a handhold in case a passenger began to fall into the gap between the train and platform.

8.	Plaintiff WEST submitted notices of claim to Defendants on July 19, 2017, pursuant to the New York State General Municipal Law § 50-e. Plaintiff WEST was deposed at a subsequent administrative hearing on October 9, 2017. Plaintiff MARIANI submitted notices of claim to Defendants on June 4, 2018, pursuant to the New York State General Municipal Law § 50-e.

9.	Accordingly, Plaintiffs hereby bring this Complaint against Defendants, alleging the following violations: (1) defective design, (2) negligence, and (3) breach of the implied warranty of merchantability. Plaintiffs and Class members seek injunctive relief. Plaintiffs seek compensation for damages they incurred and continue to incur as a direct and proximate result of Defendants' acts and omissions.

10.	The allegations in this Complaint are based on the personal knowledge of Plaintiffs as to themselves, and on information and belief as to all other matters.

---

[3] Various designs of platform safety barrier used in modern subway systems are discussed below in ¶¶ 81-86.

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because this is a class action, as defined by 28 U.S.C § 1332(d)(1)(B) whereby: (i) the proposed class consists of over 100 class members, (ii) a member of the putative class is a citizen of a different state than Defendants, and (iii) the amount in controversy exceeds the sum or value of $5,000,000, excluding interest and costs.[4]

12.     The Court has personal jurisdiction over Defendants because the Transit System operates throughout New York State; Defendants engaged in the wrongdoing alleged in this Complaint throughout the New York city area, including in New York State; Defendants are authorized to do business in New York State; and Defendants have sufficient minimum contacts with New York State and/or otherwise have intentionally availed themselves of the markets in New York State, rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. Moreover, Defendants' activity within New York State is substantial.

13.      At all relevant times hereto, Defendants were authorized to conduct business in the State of New York, causing injury to persons within the State of New York that Defendants should reasonably have foreseen.

14.     Plaintiff WEST submitted notices of claim to Defendants on July 19, 2017, pursuant to the New York State General Municipal Law § 50-e. Plaintiff was deposed at a subsequent administrative hearing on October 9, 2017. Plaintiff MARIANI submitted notices of

---

[4] The amount in controversy includes the value of the injunctive relief sought. *DiTolla v. Doral Dental IPA of N.Y., LLC*, 469 F.3d 271, 276 (2d Cir. 2006).

claim to Defendants on June 4, 2018, pursuant to the New York State General Municipal Law § 50-e.

15.    Pursuant to 28 U.S.C. § 1391(b)(2), this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District. Plaintiffs are citizens of New York State. Plaintiff WEST resides in this District and utilized the Transit System within this District. Plaintiff MARIANI utilized the Transit System within this District. Moreover, Defendants designed and operated the Transit System in this District.

## PARTIES

### Plaintiff WEST

16.    Plaintiff WEST is, and has been at all times material hereto, a resident of New York County, New York. Plaintiff WEST has been physically injured by Defendants' Transit System, most recently on May 5, 2017. On that date, Plaintiff WEST was attempting to board the Subway at the West 23rd Street Station when she fell into the ungated gap between the train and the platform. The defective design of the Transit System and its platforms create substantial risk of injury or death, and Plaintiff WEST was in fact injured due to this defective design. Furthermore, this risk has deterred her and Class members from full enjoyment of the Transit System. Both before and after her injury on May 5, 2017, Plaintiff WEST has suffered anxiety when using the Transit System due to its unsafe design. Plaintiff WEST is vision impaired.

### Plaintiff MARIANI

17.    Plaintiff MARIANI is, and has been at all times material hereto, a resident of Nassau County, New York. Plaintiff MARIANI has been physically injured by Defendants' Transit System, most recently on March 16, 2018. On that date, Plaintiff MARIANI was

attempting to board the Long Island Rail Road at Penn Station when she fell into the ungated gap between the train and the platform. The defective design of the Transit System and its platforms create substantial risk of injury or death, and Plaintiff MARIANI was in fact injured due to this defective design. Furthermore, this risk has deterred her and Class members from full enjoyment of the Transit System.

*Defendants*

18.     Defendant METROPOLITAN TRANSPORTATION AUTHORITY (hereinafter "Defendant MTA") is a public benefit corporation established by N.Y. Pub. Auth. Law § 1263. Defendant MTA is organized under the laws of the State of New York and headquartered at 25 Jamaica Avenue, Brooklyn, New York 11207. Its registered agent address for service of process is located at 2 Broadway, New York, NY 10004.

19.     Defendant MTA is a proper party because it finances the construction of the Transit System facilities. N.Y. Pub. Auth. Law § 1265(3). Thus, Defendant MTA decides how the Transit System is designed. Defendant MTA's decisions determine whether or not the Transit System facilities will be safe for all customers from the outset. Defendant MTA also establishes unified mass transit policies that control how its subordinate entities, including Defendant NEW YORK CITY TRANSIT AUTHORITY, Defendant LONG ISLAND RAIL ROAD COMPANY, and the Metro-North Commuter Railroad Company, operate. "The LIRR is of the MTA's 'subsidiary units.' Aside from the LIRR the wholly owned 'subsidiary unit' of the MTA that provides transportation services is the Metro-North Commuter Railroad Company." *Greene v. Long Island R.R.*, 99 F. Supp. 2d 268, 273 (E.D.N.Y. 2000). Defendant MTA may be understood to operate its subordinate entities, as it "is intimately involved in the management, not only of its subsidiaries' finances, but of their real estate and other assets." *Greene*, 99 F. Supp. 2d at 273. Defendant MTA is a proper party for two independent reasons: (a) because it finances and plans Defendant NEW

6

YORK CITY TRANSIT AUTHORITY's construction of Transit System facilities that are unsafe to customers; and (b) because it controls the policymaking and operations of Defendant NEW YORK CITY TRANSIT AUTHORITY.

20. Defendant NEW YORK CITY TRANSIT AUTHORITY (hereinafter "Defendant NYCTA") is a public benefit corporation established by N.Y. Pub. Auth. Law § 1201. Defendant NYCTA is organized under the laws of the State of New York and headquartered at 130 Livingston Street, Brooklyn, New York 11201. Defendant NYCTA is subordinate to Defendant MTA, as its governing board is comprised of Defendant MTA's governing board acting ex officio. N.Y. Pub. Auth. Law § 1201(1).

21. Defendant NYCTA is a proper party because it acquires transit facilities for the Subway and operates and maintains the Subway. N.Y. Pub. Auth. Law § 1202(1).

22. Defendant LONG ISLAND RAIL ROAD COMPANY d/b/a MTA LONG ISLAND RAIL ROAD COMPANY (hereinafter "Defendant LIRR") is a subsidiary public benefit corporation under Defendant MTA. Like Defendant NYCTA, Defendant LIRR is controlled by Defendant MTA's Board of Directors. *Greene v. Long Island R.R.*, 99 F. Supp. 2d 268, 272 (E.D.N.Y. 2000). Defendant LIRR is incorporated as the "Long Island Rail Road Company," headquartered at 93-02 Sutphin Boulevard, Jamaica, NY 11435.

23. Defendant LIRR is a proper party because it is an entity through which Defendants acquire LIRR transit facilities and operate and maintain the LIRR.

24. Whatever the guise of Defendants' board members when they act to establish policies that cause injury to Plaintiffs and the Class, Defendants' board members act according to the authority they have as board members of all three Defendants: Defendant MTA, Defendant NYCTA, and Defendant LIRR.

25. Defendant MTA, Defendant NYCTA, and Defendant LIRR are each proper parties because they are irrevocably linked by the persons who manage all three entities.

## FACTUAL ALLEGATIONS

### Many Customers Ride the Transit System

26. The Subway is the largest electrified rapid transit train system in the United States and the seventh largest such system in the world, with an annual ridership of 1.757 billion people in 2016.[5] On an average weekday in 2016, the Subway serves 5.7 million customers at its 472 stations.

27. The Long Island Rail Road and Metro-North Railroad are the first and third biggest commuter railroads in the United States, respectively.[6]

28. Many tourists, both domestic and international, ride the Transit System.

29. Due to the extensive use of the Transit System by New York City's citizens and tourists, the safety of such an institution should be of paramount importance to Defendants.

### The Transit System Is Systematically Unsafe

30. Defendants have maintained a culture of reckless indifference to Transit System passenger safety. Consequently, Defendants have designed and maintained systemically unsafe Transit System facilities. Over the years, riders and some of Defendants' officers have complained about Transit System safety and the egregious lack of platform guardrails. Indeed, Defendants' negligence has incurred severe consequences, including injury and death of Transit System passengers. David Jones, a board member of Defendant MTA, has requested that "transit officials

---

[5] http://web.mta.info/nyct/facts/ffsubway.htm (Last Accessed 2/26/18).
[6] "Public Transportation Ridership Report Fourth Quarter 2017" (pdf). American Public Transportation Association (APTA). May 13, 2018. Available at http://www.apta.com/resources/statistics/Documents/Ridership/2017-Q4-Ridership-APTA.pdf (Last Accessed 7/10/18).

look into platform barriers to figure out a cost, timetable for implementation and key stations where they could be installed."[7]

31.     The MTA's lack of platform guardrails has unreasonably compromised public safety, as is obvious from the multitude of newsworthy instances in which riders have fallen or been pushed onto the Transit System tracks or otherwise fallen onto the Transit System track. A few of these instances are described below. These instances likely would have been ameliorated or prevented entirely if the Transit System stations had guardrails installed.

32.     On September 6, 2010, a man was pushed onto the tracks by an unknown stranger and hit the electrified third rail. He survived with severe injuries.[8]

33.     In December 2012, a mentally unstable woman pushed Bangladeshi Sunado Sen, 36, in front of a "7" train in Woodside, Queens. Sen was killed.

34.     During the same month, a homeless person pushed Ki Suk Han, 58, of South Korea, in front of a "Q" train at the 49th Street Station in Times Square after a heated exchange.[9] As depicted in the newspaper photo below, Han attempted to climb out of the tracks as the "Q" train approached the 49th Street Station.[10] Unfortunately, Han was unable to climb out in time and he was killed. A picture of him attempting to escape was prominently featured in the media and sparked public debate about Transit System safety, although this coverage did not spur Defendants to undertake the necessary safety measures:

---

[7] http://abc7ny.com/news/mta-re-considering-subway-safety-measures-following-shoving-incidents/1607646/ (Last Accessed 3/01/18).
[8] http://www.nydailynews.com/new-york/andy-morris-survives-625-volt-zap-pushed-live-rail-drunken-brawl-article-1.440557 (Last Accessed 3/8/18).
[9] http://nypost.com/2014/11/17/at-least-4-people-pushed-in-front-of-subways-in-less-than-two-years/ (Last Accessed 6/8/17).
[10] http://nypost.com/2012/12/04/suspect-confesses-in-pushing-death-of-queens-dad-in-times-square-subway-station/ (Last Accessed 6/8/17).



Ki Suk Han of Queens, hurled to the tracks, tries to climb to safety yesterday as a train bears down on him in Midtown. He was fatally struck seconds later. **PAGES 4-5** [11]

35.     On June 1, 2015, a stranger attacked a transgender woman at the Bleeker Street station in an apparent hate crime, throwing objects at her and pushing her onto the tracks. She survived by escaping before an incoming train could hit her.[12]

---

[11] http://fox2now.com/2012/12/05/nypd-make-arrest-in-subway-push-death-image-causes-ethical-question/ (Last Accessed 3/14/18).
[12] http://abcnews.go.com/US/transgender-woman-pushed-ny-subway-tracks-hate-crime/story?id=31505252 (Last Accessed 3/07/18).

36.　　On March 5, 2016, a 15-year-old girl was pushed onto the track. She survived by squeezing into a small space between the platform and an oncoming train.[13]

37.　　On June 10, 2016, a man was seriously injured when he fainted and fell onto the tracks at the City Hall station for the "R" train. Bystanders jumped onto the tracks and lifted him up to the platform.[14]



---

[13] https://nypost.com/2016/03/06/teen-dodges-oncoming-subway-after-being-pushed-onto-tracks-police-say/ (Last Accessed 3/07/18).

[14] https://www.nytimes.com/2016/06/15/nyregion/in-a-race-to-save-a-man-on-the-tracks-a-reminder-of-whats-good-in-the-world.html (Last Accessed 3/07/18).

38.     On November 7, 2016, a 49-year-old woman from Queens was shoved into the path of a "1" train at Grand Central Station, a station where "more than 200,000 people navigate the tunnels there every day."[15]

39.     On January 25, 2017, Luis Henriquez was shoved onto the tracks at the 170th Street Station in Mount Eden as a northbound "D" train approached the station.[16] Henriquez's left leg was struck and the train's "wheel crushed the avid salsa dancer's left foot, which was so badly mangled that doctors had to amputate it." *Id.* Below is a sobering photo of Henriquez laying in a hospital bed with his left foot amputated. *Id.*

---

[15] https://www.nytimes.com/2016/11/08/nyregion/person-thrown-in-front-of-subway-train-is-killed-police-say.html?_r=0 (Last Accessed 6/8/17).
[16] http://www.nydailynews.com/new-york/nyc-crime/cops-arrest-man-pushing-stranger-bronx-subway-tracks-article-1.2958047 (Last Accessed 6/9/17).



40.     On August 22, 2017, a stranger suddenly pushed Kamala Shrestha onto the northbound "F" train track at the station at Second Avenue and Houston Street. She was injured from the fall.[17]



41.     The violent incidents above could have been prevented if guardrails were installed in the Transit System stations. The addition of guardrails would have allowed the victims more protection and lessened the likelihood of being pushed onto the tracks. In addition, platform safety gates, with their independent doors, would make it much more difficult for people to hold open Transit System car doors, and would reduce the number of hand injuries that result from people attempting to hold doors open.

42.     Using consumer fraud liability as an analogy, there have been 22 deaths caused by defective exploding Takata airbags since 2014. The danger posed by these unsafe airbags

---

[17] http://abc7chicago.com/subway-push-suspect-to-victim-maybe-well-die-together/2337769/ (Last Accessed 3/14/18).

prompted millions of product recalls.[18] Here, approximately 150-180 people are hurt, maimed, or killed by the lack of guardrails on train station platforms every year. Such extensive harm to its users must cause the Transit System to be considered unsafe.

**Visually Impaired Passengers Are in Heightened Danger from Defendants' Negligence**

43.     In addition to instances of people being pushed or falling onto the Transit System tracks, the lack of platform guardrails has also compromised the safety of visually impaired Transit System Passengers. Visually impaired Transit System passengers have difficulty determining exactly where the edge of the platform is, particularly because there is no vertical fence for them to hold on to while they board Transit System cars. This renders the Transit System discriminatory against visually impaired people. Even when they are not physically injured, visually impaired people are deterred from using the Transit System because Defendants' negligence, as described herein, has created excessive and unnecessary danger.

44.     In 2014, Luis Veloz, a blind pianist, was nearly killed on the G-train platform at the Church Avenue Station. Veloz was following the yellow tactile paving strip with his walking stick when the bumped strip disappeared, leaving him confused and disoriented. He lost his sense of balance and equilibrium, causing him to fall into the tracks."[19] The accident has cost Veloz upwards of $1 million in medical bills and future loss of earnings, since he cannot "move [his] fingers the same way" and "can no longer play a song." *Id.* A guardrail would have protected Veloz and prevented him from falling onto the tracks.

---

[18] https://www.cbsnews.com/news/takata-air-bags-recall-expands-to-3-3-million-vehicles/ (Last Accessed 7/11/17).
[19] http://nypost.com/2016/12/12/blind-man-suing-mta-for-subway-fall-that-changed-everything/ (Last Accessed 6/9/17).

## Defendants Are Aware That the Transit System Is Unsafe

45.     Defendants' actions and statements demonstrate that they are aware that Transit System platforms are unsafe without guardrails. Multiple types of documents and statements produced by Defendants each independently demonstrates Defendants' knowledge and lack of concern for safety. Such sources include: Defendants' advertised safety warnings, Defendants' internal memos, Defendants' construction plans, public statements by Defendants' officers, and the Transit System's physical infrastructure. All of these sources demonstrate that Defendants not only know that they should implement guardrails, but that they also have the financial means to construct them but simply choose not to.

### *Defendants' Safety Posters Are Ineffective and Insufficient*

46.     In 2012, Defendants implemented a new publicity campaign to remind customers to "Stand away from the platform edge."[20] This message was "widely disseminated across a wide range of materials and announcement platforms." *Id*. Defendants' article describing the campaign notes that a fall onto the Transit System tracks can "result in severe injury or even death." *Id*. Clearly, Defendants are aware of the dangers of a Transit System lacking guardrails. Nonetheless, their campaign has had little effect.

47.     Defendant's public service announcements are no substitute for actual safety features. Defendant's messages do not prevent injuries and death, yet Defendant simply repeats its messaging with updated injury and death totals. Compare below the 2011 signs with the 2017 sign discussing the danger of train collisions and citing train-impact accidents:

---

[20] http://www.mta.info/news/2012/06/20/new-series-posters-warn-customers-stay-back-platform-edge (Last Accessed 3/07/18).



# Don't Become a Statistic

## 146 people were struck by trains in 2011.
### 47 were killed.

Standing at the platform edge is dangerous!

**Be Safe. Be Smart. Stand Back.**



**No se convierta en una estadística**

En el año 2011, 146 personas fueron atropelladas por trenes.
**47 murieron.**

¡Es peligroso pararse cerca de los bordes del andén!

Cuídese. Sea inteligente. Mantenga distancia.

**請勿成為下一個受害者**

2011 年有 146 人遭到列車撞擊。
**47 人死亡。**

站在月臺邊緣十分危險！

確保安全。保持明智。靠後站。

**통계안에 포함되지 마세요**

2011년에 146명이 기차에 부딪혔습니다.
**47명이 사망했습니다.**

플랫폼의 가장자리에 서있는 것은 위험합니다!

안전하게. 지혜롭게. 뒤에 서 계세요.

**Не становитесь статистикой**

В 2011 году 146 человек попали под поезд.
**47 из них погибли.**

Стоять на краю платформы опасно!

Будьте осторожны. Будьте благоразумны. Отойдите от края платформы.





**.info**



# See Someone at Risk? Get Help.

Alert a police officer, train or station personnel. Or, use a station "Customer Assistance Intercom."

**146 people were struck by trains in 2011. 47 were killed.**

**Be Safe. Be Smart. Get Help.**

### ¿Ve a alguien en peligro? Pida ayuda.

Informe a un oficial de policía, o al personal del tren o la estación. Utilice uno de los "intercomunicadores de ayuda para los usuarios" de las estaciones.

En el año 2011, 146 personas fueron atropelladas por trenes. 47 murieron.

Cuídese. Sea inteligente. Pida ayuda.

### 看到某人有危險？獲得協助。

向警官、列車或車站工作人員報警。或使用車站的「顧客援助對講裝置」。

2011 年有 146 人遭到列車撞擊。47 人死亡。

確保安全、保持明智。獲得協助。

### 위험에 처한 누군가를 보셨나요? 도움을 요청하세요.

경찰이나 지하철 직원에게 알리세요. 또는 지하철역의 "고객지원 인터콤" 을 이용하세요.

2011년에 146명이 기차에 부딪쳤습니다. 47명이 사망했습니다.

안전하게. 지혜롭게. 도움을 요청하세요.

### Видите человека в опасности? Позовите на помощь.

Сообщите офицеру полиции, персоналу в поезде или на станции. Воспользуйтесь «Линией содействия пассажирам» («Customer Assistance Intercom») на станции.

В 2011 году 146 человек попали под поезд. 47 из них погибли.

Будьте осторожны. Будьте благоразумны. Позовите на помощь.



48. Defendants' Transit System still injures and kills approximately the same number of people per year, despite the existence of the public service announcements. Furthermore, these train collision statistics understate the scope of the problem: many people who fall onto the tracks are injured without being hit by a train, while other people who fall are not injured and escape before being hit by a train.

***Defendants Admit that Platform Gates are Beneficial Safety Features, but Will Not Install Them Without a Court Order***

49. Defendants are aware of the safety problems and that physical barriers with gates would make the Transit System safe. MTA board member Charles Moerdler stated that they are "a major safety device and crucial in preventing accidents and worse yet, people pushing people in front of trains."[21]

50. Defendants have considered plans to install platform barriers with gates since the 1980's.[22] Defendants had concrete plans to test platform safety barriers on the "L" train in 2013,[23] but the project was continuously delayed, and as of 2018 the projected completion date was 2020.[24] Ultimately, Defendants decided to divert the money for the project to other purposes and cancelled the platform safety barrier program.[25] Specifically, an MTA spokesperson stated that elevators would be installed "in response to a lawsuit calling for more accessibility."[26] Defendants are

---

[21] https://nypost.com/2016/11/15/mta-boss-makes-another-push-for-subway-platform-doors/ (Last Accessed 7/09/18).

[22] https://www.nytimes.com/2007/04/05/nyregion/05doors.html (Last Accessed 7/09/18).

[23] https://nypost.com/2013/01/12/subway-platform-door-test/ (Last Accessed 7/09/18).

[24] https://nypost.com/2017/10/24/mta-to-test-barrier-to-stop-people-from-falling-on-tracks/ (Last Accessed 7/09/18).

[25] https://patch.com/new-york/gramercy-murray-hill/new-elevators-coming-l-line-after-mta-postpones-barrier-pilot (Last Accessed 7/09/18).

[26] *Id.*

therefore demonstrably aware that these safety measures are necessary, but will not implement them absent legal action by Transit System passengers.

***Defendants' Transit System Plans Include Safety Guardrails Because They Are Necessary, but Defendants Cut Those Features for Financial Reasons While Overspending in Other Areas***

51.     Defendants' newest Subway line, the Second Avenue Subway, had originally been designed with platform guardrails. The project ultimately went overbudget by $700 million after scrapping the safety features.[27] Defendants' misprioritization of funds is not only wrong, it constitutes illegal negligence of passengers' safety.

***Defendants' Officers State that Safety Guards are Necessary, but Too Expensive—Even Though They Could be Installed at No Cost***

52.     Defendants cite cost as the reason they have not installed platform screen doors. Former transit agency president Lawrence Reuter opposed retrofitting the Transit System with platform safety barriers, and he also opposed installing platform safety barriers in the renovated Second Avenue Subway. His opposition was based on lack of benefit and potential cost: "I definitely discouraged it because it's a cost item and it's a maintenance item. It's only going to apply in a few stations. What good is it going to do if you can't adapt it to the rest of the system? I didn't see any benefit, plus it's going to cost extra money to maintain them."[28] Tom Prendergast, Defendant MTA's interim executive director in 2013, stated that Defendants would like to "take a look" at the doors, but that they could cost more than $1 million per station.[29] Clearly, Defendants are more interested in the expense of the safety materials, rather than the benefits. However, Defendants are simply indifferent to Transit System passenger safety and are uninterested in installing safety features.

---

[27] http://gothamist.com/2016/12/29/2nd_ave_subway_explainer.php#photo-1 (Last Accessed 6/08/17).
[28] https://www.nytimes.com/2007/04/05/nyregion/05doors.html (Last Accessed 7/09/18).
[29] https://www.politico.com/states/new-york/albany/story/2013/01/after-subway-push-killings-and-lhotas-resignation-the-mta-considers-platform-screen-doors-000000 (Last Accessed 3/07/18).

53.     Cost is not a legitimate obstacle to installing the required safety features in Transit System stations. As Prendergast noted, Defendants have "seen some interest from vendors eager to offset those costs with advertising." *Id*. In fact, private companies are willing to pay the **<u>entire</u>** cost of platform screen door installation.

54.     Infrastructure corporation Crown Infrastructure submitted a proposal to the city in which it would cover the cost of installing the doors if it could keep all of the revenue from the advertising that would be placed on the doors.[30] The plan was summarily rejected, and Defendants' Transit System stations remain criminally dangerous. Despite the obvious dangers of falling from the Transit System platforms (a) into the gap between the platform and the train or (b) onto the track, Defendants refuse to advise or warn passengers regarding what they should do in such a situation.[31]

### Defendants have Already Installed Simple Fences on Some Subway Platforms, Increasing Safety at Very Low Cost

55.     Although they are of limited effectiveness, Defendants have installed static fences on some Subway platforms, such as the "S" train platform at the Times Square Station. These fences are fixed with gaps between them such that when a train stops at the station, the train doors are not blocked by the fences:

---

[30] http://www.nydailynews.com/new-york/claim-mta-botched-safety-deal-article-1.1230482 (Last Accessed 3/01/18).
[31] https://www.politico.com/states/new-york/city-hall/story/2012/12/what-should-you-do-if-youre-pushed-onto-the-tracks-dont-says-the-mta-000000 (Last Accessed 3/08/18).



56. This system requires minimal cost to implement or maintain. The disadvantage of fences is that they leave much of the platform edge permanently open, so fences do not provide fully adequate safety and many falls onto the track would still occur.

**Plaintiffs' Stories: The Consequences of Defendant's Reckless Indifference**

*Plaintiff WEST's Story*

57. Defendants' culture of reckless indifference to public safety led directly to the injury of Plaintiff WEST.

58. Plaintiff WEST is a resident of 135 West 23rd Street, Apt. 702, New York, NY 10011. Plaintiff WEST was born in 1952 and has been using the Transit System for nearly her entire life. On May 5, 2017, at approximately 1:30 p.m., Plaintiff WEST walked into the West 23rd Street Station and approached the platform. Plaintiff WEST planned to take a "1" train one stop uptown to the West 28th Street station, in order to attend a writing group at the SAGE Center Midtown located at 305 7th Avenue, New York, NY 10001.

59.     Upon entering the Subway platform at the West 23rd Street station, Plaintiff WEST walked to the south end of the station. Once the uptown bound "1" train pulled into the station, Plaintiff WEST attempted to board the train when her left foot fell in the gap between the train and the Subway platform, causing her to fall partly into the gap and partly onto the train. After her fall, fellow passengers helped lift her out of the gap to safety and onto the train.

60.     Plaintiff WEST's foot fell cleanly through the gap between the train car and the platform, despite the fact that Plaintiff WEST's shoe is nearly one foot long. Once she lost her footing, she fell until her calf jammed into the gap. Due to the absence of a gate or guardrail, Plaintiff WEST became disoriented and did not step straight onto the Subway, instead stepping somewhat sideways such that her entire foot fit into the gap. Due to the absence of a gate or guardrail, Plaintiff WEST had nothing to hold onto to arrest her fall. Guardrails would have mitigated the impact of her fall.

61.     This fall caused severe hurt to Plaintiff WEST's left leg. The extensive amount of bruising that she suffered from the fall forced her to be bedridden for approximately three weeks.

62.     Although Plaintiff WEST felt that she should go to the hospital shortly after her injury, she was in shock and in immense pain and was therefore unable to make the journey. A few days after, she was able to see a physician's assistant at a medical clinic.

63.    Below are photos of her injury.







64.     Since the fall, Plaintiff WEST has experienced severe mental distress at the prospect of boarding trains, for fear of falling into the gap again. If guardrails were installed, Plaintiff WEST and Class members could feel more comfortable boarding trains.

65.     Plaintiff WEST submitted notices of claim to Defendants on July 19, 2017, pursuant to the New York State General Municipal Law § 50-e. Plaintiff WEST was deposed at a subsequent administrative hearing on October 9, 2017.

***Plaintiff MARIANI's Story***

66.     Defendants' culture of reckless indifference to public safety led directly to the injury of Plaintiff MARIANI.

67.     Plaintiff MARIANI is a resident of 230 Oakley Avenue, Apt. Basement, Elmont, NY 11003. Plaintiff MARIANI was born in 1991 and has been using the Transit System for nearly her entire life. On the March 16, 2018, at approximately 5:20 p.m., Plaintiff MARIANI was a

lawful passenger at Pennsylvania Station in Manhattan, seeking to take LIRR train #1726 at track 19 to Stewart Manor. After entering the station and arriving at the LIRR station platform, Plaintiff MARIANI was caused to fall violently into the gap between the platform and a train car as the result of the platform's lack of proper safeguards.

68.     At approximately 5:20 p.m., Plaintiff MARIANI arrived at the crowded track 19 in Pennsylvania Station. Because her usual train was not at the station, Plaintiff MARIANI learned from a nearby police officer that she should board the train currently in the station, train #1726. While Plaintiff MARIANI was alongside the train and attempting to board, she was pushed and fell between the edge of the platform and the train. She fell, up to her upper thigh, into the gap between the platform and the train and seriously injured her left leg. Two police officers and a bystander pulled Plaintiff MARIANI out of the gap and back onto the platform. The police officers took Plaintiff MARIANI to see two paramedics, who called an ambulance and treated Plaintiff MARIANI's injuries until the ambulance arrived to take her to Lenox Health Greenwich Village at 30 Seventh Avenue. The Incident Report is attached as **Exhibit A**. Plaintiff MARIANI suffered from pain emanating from deep within her leg, and the doctor at the hospital feared that it was broken. An X-ray revealed that Plaintiff MARIANI had a hematoma—internal bleeding in her leg, deep beneath the skin. Photos are below. She was prescribed over-the-counter pain medication and had to take measures to ensure that the injury would not clog.





69. Plaintiff MARIANI submitted notices of claim to Defendants on June 4, 2018, pursuant to the New York State General Municipal Law § 50-e.

**Defendants' Actionable Conduct**

70. Defendants are in the business of operating the Transit System and serving people throughout the New York City area.

71. By operating a public transportation system, Defendants act as a common carrier and implicitly represent that the Transit System is safe. Public policy—and the reasonable expectation of the public—is that passenger service will be operated with the utmost care and the highest safety standards. Accordingly, to encourage safe transportation of passengers, the law does not permit common carriers to escape liability. As operators of a common carrier, Defendants operate under an immutable "threat of liability" for dangerous conditions. *United States v. Atl. Mut. Ins. Co.*, 343 U.S. 236, 244, 72 S. Ct. 666, 671 (1952). Defendants violated and continue to violate consumers' reasonable, judicially-endorsed expectations that the system would be safe by operating their Transit System with minimal regard for passenger safety.

72. Defendants promoted and continue to promote the Transit System as being safe for riders. Relying on these or other similar representations, Plaintiffs and Class members reasonably believed in the quality and safety of the Transit System and had no reason expect that it posed a risk of adverse health consequences.

73. Plaintiffs and Class members were misled into using the Transit System, which did not provide the quality of safety that they reasonably expected to receive and believed they were receiving. As a result of Defendants' negligent systematic process and negligent acts and practices, Plaintiffs and Class members used a service that did not have a reasonable expectation of safety. Defendants thus created and failed to mitigate the unreasonable dangers associated with utilizing

the Transit System that are liable to cause serious health problems to riders, including the risk of falling from station platforms.

74. Defendants owed a legal duty to Plaintiffs and Class members to exercise reasonable care by formulating and operating a metro system that was safe for human use. Defendants knew or should have known that their failure to ensure reasonable safety standards would permit people to fall from or on the Transit System station platform, creating grave dangers for the health of Transit System customers.

75. Plaintiffs and Class members would not have used the Transit System had they known it was vulnerable to risks of falling from or on the Transit System platform.

76. Plaintiffs and Class members had no way of independently discovering Defendants' faulty systematic infrastructure and platform features or of determining how little importance was placed on public health and the safety of riders.

77. Defendants breached their duty to Transit System passengers, which directly and proximately resulted in Plaintiffs and other Class members suffering physical injury and suffering, financial injury, personal expenditure of time and resources, and mental anguish.

78. Moreover, given Defendants' duty not to expose Plaintiffs and Class members to potentially negligent systematic processes, Plaintiffs and Class members are entitled to the reasonable value of the cost of medically monitoring themselves since the need for medical monitoring is a predictable consequence of falling within a train platform.

**Plaintiffs' Injuries Are Directly Traceable to Defendants' Acts and Omissions**

79. Defendants' reckless and irresponsible systematic process permitted the Transit System to facilitate conditions in which Plaintiffs could fall on station platforms.

80.     While the discovery of one person falling on a Transit System platform might be justified as a random accident, Plaintiffs' experiences and the similar experiences of others betrays Defendants' systematic indifference to the safety of Transit System platforms.

## Defendants Should Implement a Solution

81.     Defendants are obligated to correct the dangers they have facilitated in the Transit System stations. Defendants have several options for keeping their customers safe.

82.     Defendants could have prevented Plaintiffs' falls by installing Platform Screen Doors (PSD) at the West 23rd Street station. These glass floor-to-ceiling high barriers are a type of platform safety barrier. They would have allowed all passengers, including Plaintiffs, to line up to board in an organized fashion, which in turn would have prevented jostling and falls. These doors would also provide passengers with something to hold onto as they board the train, also preventing falls. When a train is not in the station, the closed gate prevents accidental falls, suicides, homicides, and the poor judgment that sometimes leads riders to enter the tracks in order to retrieve fallen items. Platform Screen Doors also have other advantages, like improved climate control within stations, preventing litter accumulation and fire hazards, improving the acoustic quality of platform announcements, lessening wind felt by passengers waiting on the platform, and improving security by preventing passengers from venturing into subway tunnels or onto the railroad track. A PSD system would be a much-needed addition to the Subway platform safety, at the West 23rd Street station, all the other 471 MTA stations, and all LIRR and Metro-North Railroad stations.

83.     Defendants could also have prevented Plaintiffs' fall with Automated Platform Gates, another type of platform safety barrier. They. These are chest-high sliding door safeguards

that prevent passengers from falling into subway or railway tracks. Automatic Platform Gates are cheaper to install because they require less material to construct than Platform Screen Doors.[32]

84.    Automatic Platform Gates in the West 23rd Street station would have allowed all passengers, including Plaintiff, to line up and then board trains in an orderly fashion, which would prevent jostling and falls. Automated Platform Gates would have allowed Plaintiffs and other passengers to have a handhold as they entered the train. When the train is not in the station, the closed gate prevents falls. These chest high platform screen doors open in alignment with the train doors. This rudimentary system would have prevented Plaintiffs from falling in the gap between the station platform and the train. In fact, Defendants themselves have installed rudimentary metal fencing along parts of the "S" shuttle train platform at their Times Square Station and parts of the "E" train platform at their Court Square-23rd Street Station, proving that they recognize the nature of the problem and the need for a solution.

**Solutions to the Danger of the Transit System Exist in Other Parts of the World**

85.    Platform Screen Doors have been installed in many transit systems all over the world, including major European cities like Paris, Rome, and London, as well as major Asian cities like Hong Kong, Beijing, Shanghai, Tokyo, and Seoul. New York is comparable to these cities in terms of population and resources, yet its transportation system lags conspicuously behind. Platform Screen Doors have also been installed in the cities of less developed nations with markedly fewer financial resources than New York City, like New Delhi, India and Bangkok, Thailand.[33] Thus, there can be no real financial obstacle to installing these systems in New York City. While New York's Transit System is fairly old, with the first station opening in 1904[34], the

---

[32] https://en.wikipedia.org/wiki/Platform_screen_doors (Last Accessed 7-10-17).
[33] https://en.wikipedia.org/wiki/Platform_screen_doors (Last Accessed 7/10/17).
[34] https://en.wikipedia.org/wiki/History_of_the_New_York_City_Subway (Last Accessed 3/07/18).

Paris and London systems are even older, with their first stations opening in 1900 and 1863 respectively.[35] Thus, the antiquity of the Transit System is also no obstacle to installing Platform Screen Doors.

86.     Other modern countries whose transportation systems who utilize Automatic Platform Gates include Japan's Toei Subway[36] as well as the Imazatosuji Line of Osaka's Municipal Subway, whose safeguards are "1.3 meters in height and open and close simultaneously with train doors."[37]

## CLASS ACTION ALLEGATIONS

87.     Plaintiffs seek to represent a class consisting of:

All persons or entities in New York who paid to use the Transit System in New York during the applicable limitations period, and/or such subclasses as the Court may deem appropriate ("the Class").

88.     Additionally, Plaintiffs seek to represent a Subclass consisting of:

All Class Members who were injured due to the failure of Defendants to install platform barriers (the "Physical Injury Subclass").

89.     Additionally, Plaintiff WEST seeks to represent a Subclass consisting of:

All Class Members who are visually impaired (the "Visually Impaired Subclass").

90.     The proposed Class excludes current and former officers and directors of Defendants, members of the immediate families of the officers and directors of Defendants, Defendants' legal representatives, heirs, successors, assigns, and any entity in which they have or have had a controlling interest, and the judicial officer to whom this lawsuit is assigned.

---

[35] https://en.wikipedia.org/wiki/Paris_Metro; https://en.wikipedia.org/wiki/London_Underground (Last Accessed 3/07/18).
[36] http://www.railway-technology.com/projects/toei-subway-tokyo-kanto-japan/toei-subway-tokyo-kanto-japan3.html (Last Accessed 7/10/17).
[37] https://www7.dict.cc/wp_examples.php?lp_id=1&lang=en&s=subway%20network (Last Accessed 7/10/17).

91.     Plaintiffs reserve the right to revise Class definitions based on facts learned in the course of litigating this matter.

92.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff MARIANI at this time and can only be ascertained through the appropriate discovery, Plaintiff MARIANI believes that there are thousands of members in the proposed Class. Other members of the Class may be identified from records maintained by Defendants and may be notified of the pendency of this action by mail, or by advertisement, using the form of notice similar to that customarily used in class actions such as this. Other members of the Class may be notified by advertisements of the same type as those Defendants use to warn people of the dangers of falling into the gap.

93.     Plaintiffs' claims are typical of the claims of other Class members as all Class members are similarly affected by Defendants' wrongful conduct.

94.     Plaintiffs will fairly and adequately protect the interests of Class members in that Plaintiffs have no interests antagonistic to those of the other Class members. Plaintiffs have retained experienced and competent counsel.

95.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages sustained by individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for them to individually seek redress for the wrongful conduct alleged herein. If class treatment of these claims were not available, Defendants would likely unfairly receive hundreds of thousands of dollars or more in improper charges.

96.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the common questions of law and fact to the Classes are:

i.    whether Defendants made misrepresentations and/or deceptive omissions concerning the safety of the Transit System;

ii.   whether Defendants' Transit System is dangerous;

iii.  whether Plaintiff WEST, Plaintiff MARIANI, and Class members sustained injuries or damages as a result of Defendants' negligence and dangerous Transit System;

iv.   whether Plaintiff WEST, Plaintiff MARIANI, and Class members are entitled to equitable relief and prospective injunctive relief enjoining Defendants from continuing to facilitate and operate a dangerous and negligent system as alleged in this Complaint; and

v.    whether Defendants' conduct rises to the level of reprehensibility under applicable law such that the imposition of punitive damages is necessary and appropriate to fulfill the societal interest in punishment and deterrence, and the amount of such damages and/or their ratio to the actual or potential harm to the Class.

97.     The prosecution of this action as a Class action will reduce the possibility of repetitious litigation. Plaintiffs WEST and MARIANI know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

98. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by any individual class member are too small to make it economically feasible for an individual class member to prosecute a separate action, and it is desirable for judicial efficiency to concentrate the litigation of the claims in this forum. Furthermore, the adjudication of this controversy through a class action will avoid the potentially inconsistent and conflicting adjudications of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

99. The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(2) are met, as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

100. The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(3) are met, as questions of law or fact common to the Class predominate over any questions affecting only individual members and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

101. The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. Additionally, individual actions may be dispositive of the interest of all Class members even though certain Class members are not parties to such actions.

102. Defendants' conduct is generally applicable to the Classes as a whole and Plaintiff MARIANI seeks, *inter alia*, equitable remedies with respect to the Classes as a whole. As such, Defendants' systematic policies and practices make declaratory relief with respect to the Classes as a whole appropriate.

# CAUSES OF ACTION

## COUNT I

**NEGLIGENCE**
**(Negligent Acts and Omissions)**
***(Brought on Behalf of Plaintiffs, the Physically Injured Subclass, and the Class)***

103.    Plaintiffs reallege and incorporate herein by reference the allegations contained in all the preceding paragraphs of this Complaint, as if fully set forth herein, and further alleges as follows.

104.    Defendants owed Plaintiffs and the Class a duty to construct a Transit System with guardrails installed around the tracks in the stations. This duty was independent of any contractual duties Defendants may owe or have owed.

105.    The cost that would have been borne by Defendants for installing guardrails during the original construction or renovation of a Transit System platform would be insignificant in light of the dangers posed to Plaintiffs and the Class by Defendants' failure to construct a safe Transit System platform. Defendants' failure to install guardrails during the original construction or renovation was a departure from the reasonable standard of care. Accordingly, Defendants' breached their duties to Plaintiffs and the Class. As a direct, reasonably foreseeable, and proximate result of Defendants' failure to exercise reasonable care by initially installing guardrails, Plaintiffs and the Class have suffered damages, including physical injuries and financial damages. Plaintiffs and the Class could not have prevented the injuries or damages caused by Defendants' negligence through the exercise of reasonable diligence. Neither Plaintiffs nor the Class contributed in any way to Defendants' failure to install guardrails during the original construction or updating of the Transit System stations. Plaintiffs, individually and on behalf of the Class, seek to recover the

damages caused by Defendants. Because Defendants acted fraudulently and with wanton and reckless misconduct, Plaintiffs also seek an award of exemplary damages.

## COUNT II

### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
*(Brought on Behalf of Plaintiff WEST and the Visually Impaired Subclass )*

106.    Plaintiff WEST on her own behalf and on behalf of Class members re-allege and hereby incorporate all other paragraphs as if fully stated herein.

107.    Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12132 provides:

> No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

108.    Defendants are a public entity. 42 U.S.C. § 12131(1). The Transit System is an aid, benefit or service provided by Defendants.

109.    There is readily available accessible technology that can be used to make Transit System platforms safe and independently accessible to visually impaired people. Providing a gate or guardrail would neither fundamentally alter the nature of Defendants' business nor result in an undue burden to Defendants.

110.    The acts alleged herein constitute violations of Title II of the ADA, 42 U.S.C. § 12132 et seq., and the regulations promulgated thereunder. Patrons of Defendants who are visually impaired have been denied the opportunity to participate in or benefit from the aid, benefit or services that are provided to other patrons who are not disabled, and/or have been provided services that are inferior to the services provided to non-disabled patrons.

111. Defendants have discriminated and continues to discriminate against Plaintiff WEST by excluding visually impaired individuals the opportunity to participate in or benefit from the services, programs or activities of Defendants. 42 U.S.C. § 12132.

112. Plaintiff WEST is an individual with a disability within the meaning of the ADA. Plaintiff has an impairment that substantially limits the major life activity of seeing. 42 U.S.C. § 12102(2)(A).

113. Defendants have failed to take any prompt and equitable steps to remedy their discriminatory conduct. These violations are ongoing.

114. As such, Defendants discriminate, and will continue in the future to discriminate, against Plaintiff and members of the proposed class and subclass on the basis of disability by denying the opportunity to participate in or benefit from the aid, benefit or services that are provided to other patrons who are not disabled in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 *et seq.* and/or its implementing regulations.

115. Unless the Court enjoins Defendants from continuing to engage in these unlawful practices, Plaintiff and members of the proposed Visually Impaired Subclass will continue to suffer irreparable harm.

116. The actions of Defendants were and are in violation of the ADA and therefore Plaintiff invokes her statutory right to injunctive relief to remedy the discrimination.

117. Plaintiff is also entitled to reasonable attorneys' fees and costs.

118. Pursuant to 42 U.S.C. § 12133 and the remedies, procedures, and rights set forth and incorporated therein Plaintiff prays for judgment as set forth below.

119. Pursuant to 42 U.S.C. § 12133, this Court is vested with the authority to grant the Plaintiff and Class Members injunctive relief; including an order to:

i.   Require Defendants to cease and desist discriminatory practices and if necessary to cease and desist operations of their Transit System until the requisite modifications are made such that the transportation service becomes accessible to persons with disabilities.

ii.   Plaintiff has been obligated to retain the undersigned counsel for the filing and prosecution of this action. Plaintiff is entitled to have reasonable attorneys' fees, costs and expenses paid by Defendants.

## COUNT III

### VIOLATION OF THE REHABILITATION ACT
*(Brought on Behalf of Plaintiff WEST and the Visually Impaired Subclass)*

120.   Plaintiff WEST on her own behalf and on behalf of Class Members re-allege and hereby incorporate all other paragraphs as if fully stated herein.

121.   Plaintiff WEST is legally blind and therefore a qualified individual with disabilities under the Rehabilitation Act.

122.   Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, requires that no qualified individual with a disability, on the basis of that disability, be excluded from participation in or be denied the benefit of the services, programs, activities, or to otherwise be discriminated against.

123.   Defendants have discriminated against Plaintiff by failing to provide auxiliary aids and services necessary to ensure the safety of individuals who are visually impaired, in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

124.   Defendants' actions were intentional, with reckless disregard, and with deliberate indifference to the rights and needs of the Plaintiff herein.

125.    Plaintiff requests that the court enter judgement in her favor to declare that Defendants' actions violate the Rehabilitation Act of 1973, and award Plaintiff damages for her injuries, emotional suffering and reasonable attorney's fees and costs.

## COUNT IV

**VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW (N.Y.C. ADMIN. CODE § 8-101 *ET SEQ.*)**
***(Brought on Behalf of Plaintiff WEST and the Visually Impaired Subclass)***

126.    Plaintiff WEST re-alleges and incorporates herein all previously alleged paragraphs in this Complaint.

127.    The New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107(4)(a), provides that "[i]t shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation because of the actual or perceived . . . disability . . . status of any person directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . . ."

128.    The term "person" includes governmental bodies or agencies. N.Y.C. Admin. Code § 8-102(1). Defendants are a governmental body or agency and thus are "persons" within the meaning of N.Y.C. Admin. Code § 8-102(1).

129.    The term "place or provider of public accommodation" includes "providers, whether licensed or unlicensed, of goods, services, facilities, accommodations, advantages or privileges of any kind, and places whether licensed or unlicensed, where goods, services, facilities, accommodations, advantages or privileges of any kind are extended, offered, sold or otherwise made available." N.Y.C. Admin Code § 8-102(9). The Transit System constitutes a public

accommodation as it is a service, accommodation, advantage, or privilege offered to the general public and thus falls within the meaning of N.Y.C. Admin Code § 8-102(9).

130.    Defendants, as persons under the statute, acts as the "managers" of the Transit System, a public accommodation. In so doing, Defendants directly and indirectly deny to persons with disabilities the accommodations, advantages, facilities or privileges of the Transit System for the reasons set forth herein.

131.    The NYCHRL additionally requires that a "covered entity," meaning any person prohibited from discriminating under Section 8-107 on the basis of disability, "shall make reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." N.Y.C. Admin. Code § 8-107(15). The term "covered entity" is defined as a person required to comply with any provision of Section 8-107, which includes Defendants under N.Y.C. Admin. Code § 8-102(1).

132.    Defendants must make the reasonable accommodations necessary to allow persons with disabilities the opportunity to enjoy the right of benefiting from the Transit System pursuant to N.Y.C. Admin. Code § 8-107(15). Defendants have made inadequate or no reasonable accommodations to allow persons with disabilities the opportunity to enjoy the right of benefiting from the Transit System.

133.    As a direct and proximate result of Defendants' violations of the NYCHRL, Plaintiff has been injured as set forth herein.

134.    Defendants' conduct constitutes an ongoing and continuous violation of the NYCHRL and, unless restrained from doing so, Defendants will continue to violate said law. This conduct, unless enjoined, will continue to inflict injuries for which Plaintiffs have no adequate

remedy at law. Plaintiff will suffer irreparable harm in that she will continue to be discriminated against and denied the accommodations, advantages, facilities or privileges of the Transit System as well as reasonable accommodations which would provide her the opportunity to benefit from the Transit System. Consequently, Plaintiff is entitled to injunctive relief and reasonable attorneys' fees and costs.

## COUNT V

**VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW, N.Y. EXEC. LAW, ARTICLE 15 (EXECUTIVE LAW § 292 *ET SEQ.*)**
***(Brought on Behalf of Plaintiff WEST and the Visually Impaired Subclass)***

135.    Plaintiff WEST realleges and incorporates by reference the foregoing allegations as though fully set forth herein.

136.    N.Y. Exec. Law § 296(2)(a) provides that it is "an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation . . . because of the . . . disability of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . . ."

137.    Specifically, under N.Y. Exec. Law § 296(2)(c)(i), unlawful discriminatory practice includes, among other things, "a refusal to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford facilities, privileges, advantages or accommodations to individuals with disabilities, unless such person can demonstrate that making such modifications would fundamentally alter the nature of such facilities, privileges, advantages or accommodations."

138.    In addition, under N.Y. Exec. Law § 296(2)(c)(ii), unlawful discriminatory practice also includes, "a refusal to take such steps as may be necessary to ensure that no individual with a

disability is excluded or denied services because of the absence of auxiliary aids and services, unless such person can demonstrate that taking such steps would fundamentally alter the nature of the facility, privilege, advantage or accommodation being offered or would result in an undue burden."

139.    The Transit System is a "place of public accommodation" within the definition of N.Y. Exec. Law § 292(9).

140.    Defendants are subject to New York State Human Rights Law because they own and operate the Transit System. Defendants are a person within the meaning of N.Y. Exec. Law § 292(1).

141.    Defendants are violating N.Y. Exec. Law § 296(2)(a) in refusing to update or remove access barriers to the Transit System, causing the Transit System and the services integrated with the Transit System to be dangerous to the visually impaired. This inaccessibility denies visually impaired patrons full and equal access to the facilities, goods and services that Defendants make available to the non-disabled public.

142.    There is readily available accessible technology that can be used to make Transit System platforms safe and independently accessible to visually impaired people. Providing a gate or guardrail would neither fundamentally alter the nature of Defendants' business nor result in an undue burden to Defendants.

143.    By failing to provide auxiliary aids and services, Defendants have refused to take necessary steps to allow persons with disabilities the opportunity to enjoy the right of benefiting from the Transit System.

144.     Defendants' actions constitute willful intentional discrimination against the class on the basis of a disability in violation of the New York State Human Rights Law, N.Y. Exc. Law § 296(2) in that Defendants have:

      (a)     constructed and maintained a service that is inaccessible to Visually Impaired Subclass members with knowledge of the discrimination; and/or

      (b)     constructed and maintained a service that is sufficiently intuitive and/or obvious that is inaccessible to visually impaired class members; and/or

      (c)     failed to take actions to correct these access barriers in the face of substantial harm and discrimination to visually impaired class members.

145.     Defendants have failed to take any prompt and equitable steps to remedy their discriminatory conduct. These violations are ongoing.

146.     As such, Defendants discriminate, and will continue in the future to discriminate against Plaintiff and members of the proposed class and subclass on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, accommodations and/or opportunities of the Transit System under § 296(2) *et seq.* and/or its implementing regulations. Unless the Court enjoins Defendants from continuing to engage in these unlawful practices, Plaintiff and members of the subclass will continue to suffer irreparable harm.

147.     The actions of Defendants were and are in violation of New York State Human Rights Law and therefore Plaintiff invokes her right to injunctive relief to remedy the discrimination.

148.     Plaintiff is also entitled to compensatory damages, as well as civil penalties and fines pursuant to N.Y. Exc. Law § 297(4)(c) *et seq.* for each and every offense.

149.     Plaintiff is also entitled to reasonable attorneys' fees and costs.

150.    Pursuant to N.Y. Exec. Law § 297 and the remedies, procedures, and rights set forth and incorporated therein Plaintiff prays for judgment as set forth below.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of Class Members, seek judgment against Defendants as follows:

A. An order certifying this case as a class action under Fed. R. Civ. P. 23(a) & (b)(2) and/or (b)(3), appointing Plaintiffs as Class Representatives, and their attorney as Class Counsel;

B. An order requiring complete and immediate disclosure of all studies, reports, analyses, data, compilations, and other similar information within the possession, custody, or control of Defendants concerning, relating to, or involving the safety of the Transit System;

C. An order barring Defendants from destroying or removing any computer or similar records which record evidence related to the purported health and safety of the Transit System;

D. A declaratory judgment that Defendants have violated the Plaintiff's and Class members' rights as guaranteed by the ADA;

E. A preliminary and permanent injunction to prohibit Defendants from violating the Americans with Disabilities Act, 42 U.S.C. § 12132, *et seq.*;

F. A preliminary and permanent injunction requiring Defendants to take the steps necessary to make Transit System services readily accessible to and usable by visually impaired individuals;

G. A declaration that Defendants are owning, maintaining and/or operating the Transit System in a manner which discriminates against the blind and which fails to provide

access for persons with disabilities as required by the Americans with Disabilities Act, 42 U.S.C. § 12132, *et seq.*;

H. An order awarding compensatory damages in the amount to be determined for all injuries and damages described herein;

I. An order awarding punitive damages to the extent allowable by law, in an amount to be proven at trial;

J. An order awarding restitution and disgorgement of Defendants' revenues from Plaintiffs and the Class;

K. An order awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining Defendants from continuing the unlawful practices as set forth herein, and directing Defendants to identify, with Court supervision, other victims of their conduct and provide them with restitution and disgorgement of all monies acquired by means of unlawful conduct;

L. An order compelling Defendants to implement a solution to its unsafe Transit System platforms;

M. Attorney fees and costs; and

N. Such other relief as may be just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a jury trial on all claims so triable.


Dated: July 11, 2018

Respectfully submitted,

**LEE LITIGATION GROUP, PLLC**

By: _____/s/ *C.K. Lee*_____
          C.K. Lee, Esq.

C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
30 East 39th Street, Second Floor
New York, NY 10016
Telephone: (212) 465-1188
Facsimile: (212) 465-1181
*Attorneys for Plaintiffs and the Class*